AO 91 (Rev. 08/09)   Criminal Complaint

# UNITED STATES DISTRICT COURT
### for the
Southern District of Florida

| | | |
|---|---|---|
| United States of America | ) | |
| v. | ) | |
| RALPH RAMPULLA JR. | ) | Case No. 18-6300 – VALLE |
| and | ) | |
| ADAM EDWARD TONGE, | ) | |
| | ) | |

*Defendant(s)*

## CRIMINAL COMPLAINT

I, the complainant in this case, state that the following is true to the best of my knowledge and belief.

On or about the date(s) of _____1/1/2015 to 11/24/2015_____ in the county of _____Broward_____ in the _____Southern_____ District of _____Florida_____, the defendant(s) violated:

| Code Section | Offense Description |
|---|---|
| 18 U.S.C. Sections 1343, 1347 & 1349 | That the defendants did conspire and agree to execute a scheme or artifice, 1) to obtain money by means of false or fraudulent pretenses, representations, and did transmit or cause to be transmited by means of a wire or other communication in interstate commerce; 2) to defraud any health care benefit program; <br><br> and that the defendants, knowing the unlawful nature of the plan, and with intent to defraud, joined in it; In violation of Title 18, United States Code, Sections 1343, 1347, and 1349. |

This criminal complaint is based on these facts:

See attached affidavit.

☑ Continued on the attached sheet.

_____
*SA* **B ? Hll**
*Complainant's signature*

Brian Hill, Special Agent, DCIS
*Printed name and title*

Sworn to before me and signed in my presence.

Date: _____6/27/2018_____
~~06/26/2018~~

_____
*Judge's signature*

City and state: _____Fort Lauderdale, Florida_____

Alicia O. Valle, U.S. Magistrate Judge
*Printed name and title*

## AFFIDAVIT IN SUPPORT OF AN
## APPLICATION FOR A CRIMINAL COMPLAINT

I, Special Agent Brian R. Hill (affiant), being first duly sworn, hereby depose and state as follows:

### INTRODUCTION AND AGENT BACKGROUND

1.      I am an investigative and law enforcement officer of the United States who is empowered by law to conduct investigations of and to make arrests for offenses enumerated in Title 18 of the United States Code (U.S.C.). I have been employed as a Special Agent with the United States Department of Defense – Defense Criminal Investigative Service (hereinafter referred to as "DCIS") for approximately six years. Prior to my employment with DCIS, I served as a Special Agent with the United States Department of Health and Human Services, Office of the Inspector General (HHS-OIG) for seven years. I am a graduate of numerous law enforcement related courses including the Federal Law Enforcement Training Center (FLETC) Special Agent Basic Training Course (SABT), the DCIS Special Agent Basic Training Course, as well as the DCIS Special Agent Refresher Training Program (SARTP). I am currently assigned to the DCIS Fort Lauderdale Resident Agency, where I investigate violations of federal law, including conspiracies to commit health care fraud, to include the submission of false claims to the Defense Health Agency (DHA)/TRICARE program, (hereinafter referred to as "TRICARE.") My law enforcement authority to apply for this warrant is derived from Title 10, U.S.C., § 1585a.

2.      The purpose of this affidavit is to demonstrate that there is probable cause to believe that RALPH RAMPULLA JR. and ADAM E. TONGE committed violation of Title 18 U.S. Code §§ 1347 and 1349 (Healthcare Fraud Conspiracy) and 18 U.S. Code §§ 1343 and 1349 (Conspiracy to Commit Wire Fraud).

1

3.     This affidavit is based on your affiant's personal investigation and on information obtained from other law enforcement officers, witnesses, documents, federal grand jury subpoenaed information, and public records.  Because this affidavit is being submitted for the limited purpose of establishing probable cause, it does not contain each and every detail about this investigation of which I am aware.  However, no facts which would negate probable cause have been withheld.

## Compounded Medications

4.     A compounded medication is a customized combination of medicines initiated and prescribed by a physician and taking into consideration the particular patient's diagnoses, medical condition, individual health factors and reaction to other medications.  Compounded medications are prescribed after a determination that commercially available medications are not as beneficial or may be inappropriate and/or harmful to the patient.  A compounded medication is prepared by a licensed pharmacist or authorized person who combines, mixes, or alters ingredients of a drug to create a medication tailored to fit the unique needs of an individual patient in response to a valid prescription.  Since the compounded medications are individualized, they are not prepared in bulk quantities for mass distribution.

5.     A valid prescription for compounded medication is initiated and issued by a licensed prescriber who is treating the patient.

6.     The U.S. Food and Drug Administration offers the following examples of compounding drugs; if a patient has an allergy and needs a medication to be made without a certain dye; if an elderly patient or child cannot swallow a pill and needs a medicine in a liquid form that is not otherwise available; or if a patient needs an individually tailored dosage strength.

7.     Because compounded medications are custom made to fit the unique needs of

each patient, the U.S. Food and Drug Administration does not regulate or approve compounded medications and therefore does not verify the safety or effectiveness of compounded drugs. Due to the unique and individualized nature of compounded medications, such medications are neither commercially available nor distributed in mass quantities, and generally very expensive when compared to the cost of mass produced medications. [1]

### PROBABLE CAUSE

8.      RALPH RAMPULLA JR. and ADAM E. TONGE were co-conspirators in a scheme to defraud Tricare and other private insurance providers by providing patient information and prescriptions to compliant pharmacies that would then prepare compounded medications costing thousands of dollars, and then bill the insurance companies. The prescribers and the patients were frequently located in different states.[2] Some of the patients were unaware that they had been prescribed the items, others did not recognize the names of the physicians and had never had an appointment with them. It was part of the scheme that the co-conspirators would provide the prescriptions issued by physicians who had not treated the patients, but would prescribe expensive scar cream, migraine cream, skeletal muscle cream or other compounded medications. For each prescription that was successfully adjudicated, the defendants would receive a substantial portion of the proceeds from the pharmacy.

9.      ONE SMART FORCE (OSF), LLC was incorporated on or about April 8, 2015 under the laws of the State of Florida with an address of 3000 NE 190th Street, #308, Aventura, Broward County, FL 33180. This is also the residential address for RAMPULLA who is listed as the Registered Agent for OSF. TONGE is listed as an Authorized Representative (AR) of

---

[1] The defendants conduct also violates a number of Florida statutes including statutes regarding the prescribing medications, as well as laws making it a violation to solicit, offer, or pay a kickback, bonus, rebate, or bribe to induce referral to a health care facility, or health care provider.

[2] Although the practice of "Telemedicine" is permitted, it is governed by strict guidelines, including that it cannot be done from a patient's home, and requires a medical professional present with the patient to assist the physician at the appointment.

© approved facility to receive patient. (BRH)

OSF is Adam TONGE and a third individual.

10.     In March of 2015, the DCIS Fort Lauderdale Resident Agency received a complaint from Health and Human Services, Office of the Inspector General, Hartford, CT (HHS-OIG), from a compounding pharmacy (Compounding Pharmacy), located in Berlin, Connecticut, who was working with a compounding marketer in Fort Lauderdale, FL.  This compounding marketer was identified as RAMPULLA of Compound Fulfillment Direct/ One Smart Force LLC, Aventura, Florida.  HHS-OIG received the referral from the Connecticut Department of Consumer Protection, who contacted them (HHS-OIG) indicating that the Compounding Pharmacy had some concerns about a compounding pharmaceutical marketer they were currently dealing with.  The partial owner of the pharmacy, (hereinafter "Cooperating Owner"), made the complaint after it became evident that a compounding prescription they received from RAMPULLA for a Connecticut beneficiary appeared fraudulent.

11.     Compounding Pharmacy was owned by the Cooperating Owner, J.P., and L. T.–K. of Sarasota, FL.  T.–K. was the majority owner of the company and the financial backer, Compounding Pharmacy #1 is no longer in business.  T.–K. pushed the Cooperating Owner to engage RAMPULLA after the pharmacy began struggling to keep their business afloat financially.  RAMPULLA was introduced as someone who would bring in compounding prescriptions to the pharmacy and would receive a commission of 40% per prescription for doing so.  RAMPULLA was allegedly introduced to T.-K. by D.G., a former salesperson/consultant of Compounding Pharmacy.  D.G. was a pharmacist who was arrested by the Food and Drug Administration, Office of Criminal Investigations (South Florida) for manufacturing unapproved impotency drugs sold through a telemarketing service in 2001.  D.G. was sentenced to ten months in Federal Prison for these offenses.

12.     HHS-OIG interviewed Cooperating Owner and others at Compounding Pharmacy, learning that they became suspicious after receiving the first compounded prescription brought in through RAMPULLA.   Compounding Pharmacy contacted the beneficiary regarding their prescriptions, and the beneficiary indicated they did not want the prescribed medication and they wanted to cancel the order for the prescriptions. When RAMPULLA became aware that the prescription was not filled, he referenced the matter with Cooperating Owner indicating that Compounding Pharmacy cost him $650 that he paid to the telemedicine doctor to issue the prescription. RAMPULLA went on to claim that he is an expert at finding beneficiaries who have insurances that will pay for certain compounded medications without question.  He does this through several databases that he has invested in and essentially "scrubs the scripts" for favorable insurances that will pay for compounding.  RAMPULLA claimed that he could determine with 100% accuracy which beneficiaries can be targeted for compounded medications.  Cooperating Owner received a significant amount of pressure from T.–K. to utilize RAMPULLA and his employees specifically Adam TONGE in order to increase sales at the pharmacy.  T.–K. wanted Cooperating Owner and the pharmacy (Compounding Pharmacy) to allow RAMPULLA access to Compounding Pharmacy's "Emdeon" account so he could "scrub" the compounded prescriptions to see if they would payout and successfully adjudicate.  RAMPULLA also stated that "Tricare is dead," meaning they are currently scrutinizing compounding and denying claims; however, he claimed that he had the means to still get prescriptions claims paid for by Tricare.

13.     Cooperating Owner who is assisting law enforcement personnel was told that RAMPULLA would refer patients with compounded medication prescriptions to the pharmacy. In return for these referrals, RAMPULLA was supposed to receive a commission of 40% per

prescription for doing so which later changed and increased to 50% for all Tricare related compounded prescriptions that were successfully adjudicated, RAMPULLA would receive nothing if the claim did not successfully adjudicate. OSF (RAMPULLA and TONGE) was to be reimbursed was based solely on a prescription claim being processed or adjudicated successful. Cooperating Owner stated that RAMPULLA and TONGE (OSF) were going to be paid based solely on the number of patients they referred to Compounding Pharmacy that successfully adjudicated and they did not provide any other services for Compounding Pharmacy.

14.      Cooperating Owner provided the affiant with a copy of a Marketing Agreement between Compounding Pharmacy and One Smart Force, LLC (marketing entity controlled by Adam TONGE, Ralph RAMPULLA, and another person) that was signed by T.K. on April 24, 2015, and the third co-owner on May 1, 2015. This agreement states:

1) OSF's duties will be to use its best efforts to solicit orders for the sale of compounded medications for pharmacies contracted with Compounding Pharmacy and to offer these products in a clear, understandable and professional manner.

2) OSF will receive a commission of 40% of the committed total amount paid to PHARMACY (minus the acquisition cost of the chemicals required to prepare the compound medication). In the event the PHARMACY receives a denial of coverage from the Insurance Company for a non-covered patient or a non-covered medication or product then there is no commission paid. 50% commission will be paid to OSF on all Tricare claims

3) Under the Governing Law section all of the business that OSF engaged in it states they shall be governed and construed in accordance with the laws of the State of Florida, the sites of Compounding Pharmacy's Business Offices (Berlin, CT) with the exception of any statute affecting the pharmacy profession in the state that the pharmacy is located.[3]

---

[3] RAMPULLA and TONGE engaged in conduct which violates several applicable State of Florida Laws including:  Attempts, Solicitation, and Conspiracy (FL 777.04(1), Patient Brokering (FL 817.505), Kickbacks (FL 456.054), Scheme to Defraud (FL 817.034) which also encompasses the Florida Communications Fraud Act (Mail Fraud, Mortgage Fraud, or Wire Fraud), False and Fraudulent Insurance Claims (FL 817.234), and Standards for Telemedicine Practice. (FL 64B8-9.0141).

**Electronic Mails**

15.     Cooperating Owner provided the affiant with a copy of a Compounding Pharmacy, LLC (Pharmacy) e-mail dated June 1, 2015 at 11:06 AM, From:  T.-K., To:  "Dr. Compound"  (smartl@compoundfulfillmentdirect.com) who is Ralph RAMPULLA the CEO of Compound Fulfillment Direct,  CC:  Smart Ones (smartlllc@gmail.com / Adam TONGE); Employee #1:  Cooperating Owner, Subject:  Game Plan Tomorrow.  Contained within the e-mail is the following:

> *"(Employee #1), Adam advised he sent you the list of 48 scripts last Tuesday but we have not had the time to dedicate getting them put thru QS1.  Can Ashley take the time today to work with the formulations to see what gets accepted? According to Ralph and Adam, 3 out of 10 gets approved.  We need to determine what makes those 3 get approved and record those bin numbers.  As far as Emdion, is it possible to give Adam limited access to QS 1 so he can see what our system is and what it can do?"*

16.     Cooperating Owner provided the affiant with a copy of a Compounding Pharmacy, LLC (Pharmacy) e-mail dated June 8, 2015 at 4:06 PM, From:  Smart Ones (smartlllc@gmail.com / Adam Tonge) To:  (Employee #1), CC: Cooperating Owner, Subject: Re:  Working hard at it!.  Contained within the e-mail is the following:

> *"Great were are now submitting patients to telemed what I really need is can you create me a log in to pk so I can check insurance availability on patients?"*

TONGE is telling Employee #1 in the e-mail that (OSF) has been submitting patients to the prescribers to receive telemedicine approval for prescriptions to be generated for the compounded medications.

17.     Cooperating Owner provided the affiant with a copy of a Compounding Pharmacy, LLC (Pharmacy) e-mail dated June 9, 2015 at 10:33 PM, From:  T.-K. To: (Cooperating Owner) and Employee #1, CC: (Compounding Pharmacy, Subject:  OSF.

Contained within the e-mail is the following:

> \* (Employee #1) must call Adam and understand EXACTLY what we need to do to get REAL scripts.
> \* We will either have to fork out the cash and use EMDION or we give Adam user access to our QS1 software immediately, we MUST do one or the other.
>
> We do not have time to scrub 100 possible scripts to get 10 to go thru. By using our QS 1, they can download their list of patients and very quickly filter it to determine which scripts will bill out. Ralph is not going to spend $12,000.00 to go to Teledoc to scrub a patient - we can do that with our software. Until we have Emdion or Adam can access QS1, their hands are tied and we will see NO billable scripts. ... They have no problem working with the other pharmacies - they have EMDION or let Adam work with their software to ensure a higher success rate with getting scripts thru. We are NOT ready to fill and bill scripts (like I have been told we are) until we have functioning software to filter a lot of information. Adam and Ralph are volunteering to do this filtering for us - there is no way we have the time to do it. They will filter the list and give us the scripts that have a higher % of being approved. They will pre-adjudicate the scripts. ...

18.    Cooperating Owner provided the affiant with a copy of a Compounding Pharmacy, LLC (Pharmacy) e-mail dated June 30, 2015 at 2:34 PM, From: Employee #2 To: (Cooperating Owner), Subject: FW: Compounding Script (document# 22). Notated in the body of the e-mail it reads:

> "We received a script from Adam!" Also attached (image 2015-06-30-142557) is a prescription for patient "KY" who is identified as Kxxxx Yxxxx (Boynton Beach, FL). Further examination of the prescription shows that patient "KY" was had a generated prescription sheet form completed by prescriber S.L. (Great Neck, NY) for several compounded pain creams to include one for Combination Pain – 360 grams with (6) refills, one for Migraine – 120 grams with 6 refills, one for Scar – 240 grams with (6) refills, and a Vitamin Supplement directed to take (2X a day) 50 capsules, with (6) refills.

19.    Cooperating Owner provided the affiant with a copy of a Compounding Pharmacy, LLC (Pharmacy) e-mail dated July 7, 2015 at 1:30 PM, From: Employee #2 (Compounding Pharmacy Technician), To: Cooperating Owner, Subject: Compounding Issue. Contained in the e-mail is the following:

> "I working on a patient that was sent over from Dave's "people"[4] Insurance wasn't

---

[4] "Dave's People" is OSF, this was verified by the Affiant who asked Employee #1 who clarified it

*working so I called the insurance company-the insurance company told me that the insurance has not been active since 2012. This was the most up to date info the doctor had as well. I then called the patient to see if she could give me her insurance info. She asked what was called in - I told her a scar cream and she told me that she has no scars - I asked if she had seen the doctor that sent in the prescription and she said she hasn't for a long while now. I told her that I was sorry for bothering her and to disregard my call. I texted Dave and told him all of this and he just kept asking who the patient was, I told him he needed to speak to Employee #1 from now on because I no longer want my hands in his project. This all seems very odd & sketchy to me, why would they call in a script for a patient they haven't seen in a long while and who doesn't even have a scar?"*

20.     Cooperating Owner provided the affiant with a copy of a Compounding Pharmacy, LLC (Pharmacy) e-mail dated July 24, 2015 at 3:57 PM, From:  T.-K. (Co-Owner 4U Pharmacy), To:  Employee #1, CC'd:  Smart Ones <smartlllc@gmail.com>(Adam Tonge) and Cooperating Owner, Subject:  scripts.  Contained in the e-mail is the following:

*"How are you making out with the scripts that have come in? AM I able to look at the folder where you are keeping a running tab of each script and status? Adam, did you say you called (Patient) and she said she does want the script? We need to understand why we are getting different info. Adam, I am assuming that now you are doing the eligibility checks, we no longer have to call the patient - is that correct? It is my understanding scripts will be faxed to us that patient has approved and doctor has signed off on and all we do is have to fill the script and bill it - it this correct?"*

21.     Cooperating Owner provided the affiant with a copy of a Compounding Pharmacy, LLC (Pharmacy) Conference Call / Meeting Notes document dated July 24, 2015 at 4:00 PM.  The affiant observed a screen shot of TONGE's computer that displayed (2) patients from Connecticut, (2) from Rhode Island, and (5) patients from Florida that had information related to compounded prescriptions (this available upon review).

22.     On February 26, 2018, the affiant received a forwarded e-mail from Cooperating Owner who has provided law enforcement with assistance regarding the on-going investigation of OSF (RAMPULLA and TONGE).  The contents of the is e-mail are detailed as follows From: Smartl <smartlllc@gmail.com> (Adam TONGE), Sent:  Wednesday, August 19, 2015      9:55

was in fact D.G. and in the context of this comment his people refer to OSF who are RAMPULLA and TONGE.

AM, To:  K.-T.; Dr. Compound (Ralph RAMPULLA); (Employee #1); Cooperating Owner,

Subject:

> "(Employee #1) *you put down that L.B. insurance doesn't cover / then you said/ No card finder /then// CALLED PATIENT FOR INS INFO-PAJIENT DOES NOT WANT So I find it strange that you have 3 different reasons as to why this wasn't filled, 1) Ins don't cover? 2) then you called patient for ins? 3) Then the patient doesn't want?*
>
> *Well if insurance doesn't cover why would you call the patient to get insurance info? After reading this I decided to call the patient myself to see how she could of told us that she wants it? Then she told the doctor she wants it? Then you get it and when you call as your notes say, she doesn't want it? After calling she stated she never got a call tram care 4 you and she still wants the creams. I then <u>decided to send to the script to another pharmacy</u> since you disposition it dead deal. <u>Within the hour I checked on the status from the other pharmacy</u> and when they called the patient she still wanted the creams when they asked, next <u>her insurance approved not 1 but 4 different creams and was adjudicated for a total amount of $21,615.00 with 4 more refills after that. Once all are filled it would total $86,604.00 witch care for you would of seen over 50k in revenue!</u> So After I decided to call you this morning you were really rude towards me for the first time, and then you were saying that your doing all this work for free and then making the comment to me about how few scripts I'm sending, and the quality as you say? Well the quality inst as bad as you made i out to be. So I like to know what you have to say about this? Next topic <u>Their is also 2 patients the Glough's witch were already had pre adj for 1 Ok each but the pharmacy is out of network and the payer only allows mail orders from a pharmacy in the state of Connecticut so these two should be easy ones for you to bill and fill.</u> But still you have yet to get these done at all in over a month? So now I'm really starting to doubt your ability to do your job? I have been nothing but polite, respectful, and patient with you from the start but I cant allow T.-K. to be fooled with information that isn't the facts! <u>I have placed a screen shot in the email with the adj totals for you all to see for yourself.</u> I only wanted us to work together and excel! Its hard for me to write this email knowing how much time and energy T.K. and myself have done to get to this thing off the ground but now due to poor operations and diligence by you, the only ones who will be celebrating this success will be our team when I wish it was all of us celebrating as a team!*

23.     The affiant reviewed the screen shot that was attached to the e-mail showing eleven patients names, one from the State of Rhode Island, three from the State of Connecticut, and seven from the State of Florida.  These names reflect patients that OSF (RAMPULLA and TONGE) sent to Compounding Pharmacy (Employee #1) in an attempt to process for a compounded prescription.  On page #3 the affiant observed patient information ("LB") for four different compounded prescriptions all dated on 08/11/2015, with different RX numbers 102722

(Scar Cream), 102723 Chronic Pain & Inflammation), 102724 (General Joint & Musculoskeletal Pain), and 102725 (Migraine Cream). The sales representative is listed as MedMax 400. It should be noted that the affiant interviewed an FBI source who was the principal of a marketing business (MedMax). The source advised the affiant that "MedMax 400" is actually the sales representative identifier for OSF (RAMPULLA and TONGE) that was used to track what patient was under OSF so they would receive proper credit and compensation if the compounded prescription was adjudicated by the pharmacy. On the very bottom of page #3 the affiant observed a digital signature with the Smart1llc@gmail.com which is the e-mail for TONGE and a phone number of (407) 221-2451. The affiant conducted a law enforcement query of this phone number showing affiliation to the business entity name of "SMART1" and a utility listing detail with the name being associated to the phone number of Adam TONGE. The associated address is listed as 1619 Glenwick Drive, Windermere, FL 34786; this address is listed on TONGE's State of Florida driver's license as being his residential address as well.

24.     Cooperating Owner and other employees of Compounding Pharmacy were interviewed and stated that there were instances in which Compounding Pharmacy contacted the beneficiary/patient regarding their prescriptions, and the beneficiary/patient stated that they had no knowledge of the prescription and that they did not want the drugs that were purportedly prescribed to them.

### Information Obtained Through Consensually Monitored Phone Calls

25.     On June 25, to 2015, Cooperating Owner engaged in a consensually monitored phone call with RAMPULLA. In this call, RAMPULLA explained that he writes 2,000 prescriptions a day and pays a telemedicine doctor $650 for each script. RAMPULLA stated that because he pays so much for the prescription he cannot afford to only have 10% actually get paid

out (adjudicated) by insurance companies. RAMPULLA also said he did 10,000 prescriptions for a pharmacy called RX-Pro located in Mississippi. RX–Pro is currently under investigation by DCIS and other law enforcement agencies for health care fraud and related offenses.

26.  In another consensually monitored phone call made by Cooperating Owner on August 7, 2015, to RAMPULLA bragged that he did $220,000 worth of business last month and works with pharmacies in California, Florida, Nevada, Maryland and Philadelphia.

27.  Your affiant has reviewed a recorded telephone call that took place between Employee #1 and TONGE (OSF) on July 20, 2015. During the recorded call, Employee#1 is having a conversation with TONGE specifically about processing compounded prescriptions for patients. During their conversation, they are talking about patients whose prescriptions were being sent to Compounding Pharmacy to provide compounded medications for those patients by TONGE and his associates at OSF. There were eight patients discussed during this call, including L.B. The discussion included problems with the patient's insurance, rejected prescriptions due to non-coverage by the insurer.

### Facts Provided by Cooperating Interviewed Patients/Beneficiaries

28.  Employee #1, former Pharmacist in Charge for Compounding Pharmacy, provided agents with prescriptions that Compounding Pharmacy received from RAMPULLA and TONGE (OSF). Agents interviewed a number of the patients and some of the physicians listed on these prescriptions provided by RAMPULLA and TONGE (OSF). Cooperating Owner confirmed that all of the telemedicine prescriptions discussed below were referred to Compounding Pharmacy by RAMPULLA and TONGE (OSF). Cooperating Owner and Employee #1, told agents they have had several phone conversations with RAMPULLA and TONGE (OSF) about these prescriptions.

29.     Compounding Pharmacy received a prescription sent by OSF for patient (#1)

"L.B." (Southbury, Connecticut) on May 13, 2015, for a topical scar, pain and migraine creams

that were prescribed by Dr. N.C. on February 23, 2015.   The prescription contained the

personally identifiable information (PII) of L.B. and Dr. N.C. including Dr. N.C.'s [5]DEA and

NPI[6] numbers.   Dr. N.C. proffered through her attorney that she had no knowledge of this

prescription and did not give anyone to use her PII to attempt to submit a claim to a private health

insurance company.   Agents have examined several signatures of Dr. N.C. contained on

prescriptions she actually wrote to the signature that purported to be hers on the prescription sent

to Compounding Pharmacy for L.B.  The signatures do not appear to be similar.  Employees at

Compounding Pharmacy contacted L.B. to verify some information on the prescriptions in order

to process the claim through her private health insurance coverage.  L.B. told Compounding

Pharmacy she did not want the prescriptions.  L.B. told Agents she has never spoken to, met, or

heard of Dr. N.C. and did not give anyone permission to use her personally identifiable

information to fill a prescription written by her.  L.B. stated she has received numerous calls

from telemarketers trying to prescribe her medication and supplies for diabetes, however L.B.

has never been diagnosed with diabetes.  Prescription claims data for L.B. was obtained from her

insurer using her unique identifiers.  Compounded medication prescriptions were written for L.B.

starting on December 19, 2013, and which were filled beginning on March 21, 2014, (submitted

amount: $28,080.65 and paid amount: $16,852.94 with a total of 53 processed claims) for five

different pharmacies, two in Connecticut, one in California, one in South Carolina and one in

---

[5] A DEA number refers to a license issued by the U.S. Drug Enforcement Administration to doctors to write
prescriptions containing drugs which are regulated by the DEA.
[6] A National Provider Identifier or NPI is a unique 10-digit identification number issued to health care providers in the
United States by the Centers for Medicare and Medicaid Services (CMS). The NPI is the required identifier for
Medicare services, and is used by other payers, including commercial healthcare insurers. The transition to the NPI
was mandated as part of the Administrative Simplifications portion of the Health Insurance Portability and
Accountability Act of 1996 (HIPAA), and CMS began issuing NPIs in October 2006.

Florida. Specific claims analysis was performed as it related to Compounding Pharmacy showing that on February 23, 2015, a compounded prescription (RX #000006018769) written by Dr. N.D. from Elizabeth, Colorado was processed by the pharmacy with a submitted ingredient cost of $6,198.91 and was paid $5,295.18 which was charged to L.B.'s insurance. L.B. has stated that she did not authorize the prescription. There were also (24) compounded medication prescriptions that were denied/rejected/reversed written between May 8, 2014, through January 5, 2016. It should be noted that Dr. R.E. (New Smyrna Beach, Florida) was the prescriber on approximately one-half of the denied/rejected/reversed compounded prescription claims. Dr. R.E. is a prescriber that worked closely to generate prescriptions for OSF and is a subject or a person of interest in several DCIS investigations across the country. If these (24) claims had been paid they would have cost the insurance carrier(s) $119,216.94.

30.     There were several attempts to adjudicate compounded prescriptions for other patients/beneficiaries through Compounding Pharmacy by RAMPULLA and TONGE (OSF) that would not process due to the insurance not covering the associated costs. These patients/beneficiaries were also contacted by either pharmacy (Compounding Pharmacy) personnel or law enforcement personnel they all stated they did not know the prescriber, they did not give anyone permission to use their personally identifiable information (PII), and that they did not want these compounded medications. These additional patients are identified as:

(1) Compounding Pharmacy received a prescription sent by OSF for patient (#2) "G.B." (Lakeland, Florida) on August 3, 2015, prescribed by Dr. A.S. (Boca Raton, FL). Based on information received by your affiant from the insurance carriers, had this prescription been successfully adjudicated, the submitted amount would have totaled $66,418, and the amount potentially paid by the

insurance carrier would have been $55,790.

(2) Compounding Pharmacy received a prescription sent by OSF for patient (#3) "P.P." (Winter Haven, FL) on July 23, 2015, prescribed by Dr. R.E. (New Smyrna Beach, FL) (who was promised a $50.00 gift card after completing a survey). Based on information received by your affiant from the insurance carriers, had this prescription been successfully adjudicated, the submitted amount would have totaled $112,504, and the amount potentially paid by the insurance carrier would have been $96,170.

(3) Compounding Pharmacy received a prescription sent by OSF for patient (#4) "J.S." (Orlando, FL) on September 22, 2015, prescribed by Dr. R.E. (New Smyrna Beach, FL). Based on information received by your affiant from the insurance carriers, had this prescription been successfully adjudicated, the submitted amount would have totaled $25,354, and the amount potentially paid by the insurance carrier would have been $21,297.

(4) Compounding Pharmacy received a prescription sent by OSF for patient (#5) "D.S." (Orlando, FL) on September 22, 2015, prescribed by Dr. R.E. (New Smyrna Beach, FL). Based on information received by your affiant from the insurance carriers, had this prescription been successfully adjudicated, the submitted amount would have totaled $200,812, and the amount potentially paid by the insurance carrier would have been $170,560.

(5) Compounding Pharmacy received a prescription sent by OSF for patient (#6) "L.B." on August 17, 2015, prescribed by Dr. N.C. Based on information received by your affiant from the insurance carriers, had this prescription been

successfully adjudicated, the submitted amount would have totaled $192,122,
and the amount potentially paid by the insurance carrier would have been
$159,721.

(6) *All of these prescriptions in the above paragraphs were sent by fax or by e-mail.* (RR)

31.     Each of the patients discussed above has been interviewed and stated that they did
not request the prescriptions listed.

32.     Cooperating Owner and the affiant reviewed patient prescription information that
she had previously relayed were sent by OSF.   The affiant relayed that the prescriptions
specifically L.B., G.B., P.P., D.S. and J.S. had all been reviewed thoroughly.   Specifically at the
top of every faxed document to Compounding Pharmacy was a banner displaying that the fax
was sent to Employee #1 (pharmacist in charge), the number of pages, a number where the
documents originated from identified as (888)881-3312, and an entity named Telemed
Compliance.   Cooperating Owner told the Affiant she was aware that Telemed Compliance was
associated with RAMPULLA and TONGE.   Cooperating Owner reiterated that TONGE told
pharmacy personnel that he kept track of which prescriptions OSF sent to Compounding
Pharmacy through a spreadsheet on Google Documents, as this would also be how they (OSF)
knew what they were to be paid out for successful adjudications.   According to Cooperating
Owner, RAMPULLA and TONGE were faxing several prescriptions for compounded
medications to Compounding Pharmacy daily.   Because this electronic activity used the wires to
cross state borders, it is sufficient to establish wire fraud.

### Follow-Up Interview with Employee #1 on February 27, 2018

33.     On February 27, 2018, the affiant made telephone contact with Employee#1
who was the pharmacist in charge ("PIC") for Compounding Pharmacy while he was employed

there.

34.     Employee #1 said it took a few months for compound medicine prescriptions to start coming into the pharmacy (Compounding Pharmacy) via the fax machine from OSF personnel (RAMPULLA and TONGE). Employee #1 learned by telephone contact at first with RAMPULLA and a few months later with TONGE that the faxed prescriptions were in fact coming from OSF personnel (RAMPULLA and TONGE). Both asked Employee #1 to verify whether the prescriptions were received on Employee #1's end at the pharmacy via a phone call or in e-mails. Employee #1 stated that they (RAMPULLA and TONGE) often discussed the patients over the phone and these patients were the same exact ones that Compounding Pharmacy received from OSF (RAMPULLA and TONGE) via fax.

### Prescription Sheets Observed by Employee #1

35.     According to Employee #1, the prescription pads did not look the same as what he was used to seeing which was apparent from the start with the business relations ship between OSF (RAMPULLA and TONGE) and Compounding Pharmacy. During the course of the follow-up interview Employee #1 opined that the prescription sheets looked more like a "menu" of what to order as it pertained to compounded medications. Employee #1 said he did not make the prescription sheets nor did he have anything to do with their production, as they arrived directly from RAMPULLA already pre-made.

36.     Employee #1 recalled that the prescription sheets had categories with formulas listed out; he explained that the ingredients in the formulary for the compounded medications that were listed on the prescription sheet were already maximized, especially when he saw the wholesale price and the actual costs associated with making the compounded medications. Employee #1 added that the prescriber did not need to create a formulary, rather the prescriber

only needed to check a box next to a pre-determined formulary which already had the gram amount dosage populated and number of refills populated. He understood this done in this manner to maximize reimbursement and no real care or concern for patient welfare or medical necessity.

37.     Employee #1 stated that RAMPULLA made comments to him such as: "don't worry about it as I have the doctors in my back pocket". He also commented that RAMPULLA said he "did not need Compounding Pharmacy" and "could use other pharmacies to get compounded prescriptions adjudicated".

### Employee #1 Directed to Mass Produce / By-Pass FDA Regulations

38.     Employee #1 told the affiant he was aware compounding was a specialized process, and understood he was not to mass-produce the same compounded prescription in bulk to then be sold off to individual patients. Employee #1 knew that each compounded prescription was to be manufactured for one patient and that one patient only. Employee #1 further said he was also aware that this was a regulation set by the Food and Drug Administration (FDA).

39.     Employee #1 said he was directed by RAMPULLA to ignore this FDA regulation, as it would be much easier to mass-produce the compounded prescription medications in one batch, and then sell individual patient prescriptions from the larger single batch. RAMPULLA explained on many occasions to Employee #1 that another pharmacy he was doing business with was mass-producing compounded prescriptions in single large batches, and he wanted Employee #1 as Compounding Pharmacy's "PIC" (pharmacist in charge) to do the same thing. Employee #1 said he told RAMPULLA he would not mass-produce and send out "single's" from large batches of compounded medication to RAMPULLA so he could then repackage them into smaller patient doses and sell them elsewhere. According to Employee #1, RAMPULLA told

him that he was going to make "singles" from the mass-produced batches and sell them independently.  Employee #1 again said he told RAMPULLA "No," as he was not a licensed manufacturer.

### Refill Process "Pushed" by RAMPULLA

40.     Employee #1also stated that the refills for the compounded medications were set to be "Auto-Refilled" where a patient did not have to call in to authorize a refill at the end of (30 days) or their supply was depleted.  Employee #1 explained that RAMPULLA wanted Compounding Pharmacy to set-up each patient receiving compounded prescriptions with "Auto-Refills" as a default.  Employee #1 said RAMPULLA wanted the auto refills as a default because RAMPULLA would get a percentage/portion of the refill adjudication every month if it paid out.

### Test Claims Completed by OPTUM RX Insurance Carrier

41.     On February 26, 2018, the affiant made contact with OPTUM RX who previously responded to a Grand Jury Subpoena for claims data and information as it pertained to several patients that had compounded prescriptions generated for them by OSF (RAMPULLA and TONGE) and then sent to CompoundingPharmacy to be filled for compounded medications. Some of these claims were rejected/denied/or reversed for various reasons.  The affiant asked OPTUM RX to complete what is referred to as a "TEST Bill" to see what the compounded prescription would have paid out had it have successfully been adjudicated.  ~~The chart below~~ *As previously ~~paid~~ discussed in paragraph 30.* ~~depicts~~ the submitted/billed amount, the amount that would have been paid by the insurance carrier, ~~the number of refills for each patient that was notated on the prescription sheet,~~ the listed prescriber, and the way the prescriptions sheet was sent by OSF (RAMPULLA and TONGE) to Compounding Pharmacy.

42.     On March 16, 2018, the affiant received confirmation from CVS Caremark (CVS) another insurance carrier that has been effected by the compounding pharmacy fraud throughout the country.  Copies of the prescriptions for patients were sent to CVS to check for exposure to their insurance plans.  No loss was reported from their plan but they were able to calculate the amount that would have been adjudicated for the specific compounded prescription claims provided by the affiant if they would have gone through and successfully adjudicated with the CVS insurance plan

43.     A review of the "TEST Bills" of the four patients reviewed by OPTUM RX showed that OSF (RAMPULLA and TONGE) would have been responsible for any amounts submitted and paid out to Compounding Pharmacy since these patients were derived from their marketing efforts.  Calculations were prepared by CVS Caremark as well for the other two patients (DS and PP) who had no exposure with OPTUM RX.  As a result of the six prescriptions sent by OSF (RAMPULLA and TONGE) Compounding Pharmacy would have billed the insurance carrier(s) $852,202.29 and been paid out an adjudication amount of $526,168.53.  As previously noted the reimbursement rate for OSF was originally 40 % per script, it was changed reflect a 50% payout for all Tricare prescriptions and 40% for any other prescription filled.  At a rate of 40% OSF personnel (RAMPULLA and TONGE) were set to be paid $210,467.41 for the adjudicated prescriptions.

44.     All of these prescriptions were derived in a manner that is not consistent with typical medical practice; they are consistent with conspiring to commit healthcare fraud, submitting false claims, and fraud by means of wire (FAX and E-mail).  All of the prescriptions discussed above were sent via a FAX machine or electronically by way of e-mail from OSF (RAMPULLA and TONGE) to Compounding Pharmacy which constitutes federal violations of

Wire Fraud.  A total of 26 compounded prescriptions were contained in 3-Ring Binder that was

provided to agents by Cooperating Owner.  She relayed that all 26 of the prescriptions were

supplied by OSF (RAMPULLA and TONGE) to Compounding Pharmacy for processing.

## CONCLUSION

45.    Based upon the foregoing facts, the training, experience of the affiant and agents

working this investigation.  The facts as set forth in this document there is probable cause to

believe that violations of Title 18 U.S. Code §§ 1347 and 1349 (Healthcare Fraud Conspiracy),

18 U.S. Code §§ 1343 and 1349 (Conspiracy to Commit Wire Fraud), have been committed by

the individuals identified as the controllers OSF, Ralph RAMPULLA and Adam TONGE.

Respectfully submitted,

Brian R. Hill
Special Agent
Department    of    Defense-    Criminal
Investigative Service

Subscribed and sworn to before me
on this____ of June, 2018.

HONORABLE ALICIA O. VALLE
UNITED STATES MAGISTRATE JUDGE